228 F.2d 66
 UNITED STATES of America for the use of ACME MAINTENANCE
ENGINEERING COMPANY, a corporation, Appellant,
v.
WUNDERLICH CONTRACTING COMPANY, a corporation; Curlett
Construction Company, a corporation; Charles H. Tompkins
Company, a corporation; Continental Casualty Company, a
corporation; National Surety Corporation, a corporation; and
Travelers Indemnity Company, a corporation, Appellees.
 No. 5110.
 United States Court of Appeals Tenth Circuit.
 Nov. 25, 1955.
 
 1
 Bryant H. Croft, Salt Lake City, Utah (John H. Gordon, Los Angeles, Cal., was with him on the brief), for appellant.
 
 
 2
 Allan E. Mecham and Elliott Lee Pratt, Salt Lake City, Utah, for appellees.
 
 
 3
 Before PHILLIPS, Chief Judge, HUXMAN, Circuit Judge, and SAVAGE, District Judge.
 
 
 4
 SAVAGE, District Judge.
 
 
 5
 This is an appeal by Acme Maintenance Engineering Company[1] from an adverse judgment in an action brought under the Miller Act, 40 U.S.C.A. §§ 270a and 270b to recover the balance alleged to be due on a subcontract entered into with Wunderlich Contracting Company, Curlett Construction Company and Charles H. Tompkins Company,[2] who were awarded a contract by the United States for the construction of a Veterans Administration hospital at Salt Lake City, Utah. Appellees, Continental Casualty Company, National Surety Corporation and Travelers Indemnity Company, as sureties on Wunderlich's payment bond, were joined as defendants.
 
 
 6
 The subcontract entered into on June 12, 1950, required Acme to furnish all labor and materials and install all roofing, in accordance with the plans and specifications and all applicable provisions of the prime contract, for a consideration of $114,135. The installation of the roofing was completed by Acme and periodical payments were made, leaving a balance due of $3,179.33. Wunderlich refused payment, claiming credits for this amount because of expenditures for roof repairs. The court, after a trial without a jury, decided that the disputed credits should be allowed and entered judgment for Wunderlich.
 
 
 7
 The credits contended for by Wunderlich consisted of two items, one in the sum of $2,965.57, and the other for $213.76. Acme had completed all of the roofing and left the job in 1951. The construction of the hospital was not finished by Wunderlich and accepted by the United States until 1953. In May of 1952, the roof on Building I became damaged as a result of water getting between the roofing and the cement deck upon which it was laid. Acme disclaimed any responsibility for the damage and Wunderlich paid one A. M. Gulbransen $2,965.57 to replace a part of the roof. The smaller item represents the amount paid for excavating and moving dirt in order to repair the roof of a tunnel which extends from one building to another. The settling of dirt caused the tunnel to pull away from the building. This tunnel roof was also repaired by Gulbransen in 1952, but the claim for a credit was limited to the excavation cost for reasons not disclosed by the record.
 
 
 8
 Wunderlich argued in the court below and argues here that Acme was obligated by the terms of the subcontract to complete the roofing in a manner satisfactory to the government upon final acceptance of the entire project and that Acme was bound to make all repairs at its expense regardless of the cause of damage. In addition, Wunderlich undertook to prove that the damage to the roof of Building I resulted from improper installation by Acme.
 
 
 9
 The trial court allowed the set-off in connection with the tunnel roof repairs upon the theory that the subcontract made Acme responsible for all roof damage occurring before final acceptance of the project. There was no proof nor was a finding made of faulty installation of the tunnel roofing by Acme.
 
 
 10
 But some evidence was presented which tended to show that the damage to the roof on Building I was caused in part by the improper manner in which the roofing was laid by Acme around a vent pipe. The uncontroverted evidence disclosed, however, that such damage was partially caused by the derelictions of other subcontractors. The court made a finding that 'the plaintiff improperly installed the roofing around a certain vent pipe' which 'together with the careless and wrongful construction activities of other subcontractors caused damage to the roof of Building I.' In addition, the court found that 'the plaintiff did not introduce any evidence to segregate the amount of repairs attributable to the defective work around the vent pipe and the amount of repairs attributed to the defective work of other subcontractors.' It is thus made clear that the trial court was of the opinion that, since the evidence disclosed that the defective work of Acme had combined with negligence of other subcontractors to cause the damage to the roof, the burden of proof was upon Acme, if it was to avoid liability for all damages, to show the extent of the damage inflicted by other parties.
 
 
 11
 Acme urges as grounds for reversal, (1) that its liability under the subcontract was limited to damage resulting from its defective workmanship; (2) that the evidence was insufficient to show any defects in the installation of the roof; and (3) that the burden of proof was on Wunderlich to establish its claim of set-off.
 
 
 12
 We find nothing in the contract which would impose liability upon Acme for roofing repairs necessitated by the negligent or wrongful conduct of other subcontractors. The pertinent provisions of the contract are:
 
 
 13
 'Article IX. 'Subcontractor further agrees: * * * (2) Removal of Rubbish, Property Damage, etc. That in order to eliminate controversy and the necessity of backcharging, Subcontractor will promptly remove his own rubbish, will repair promptly all damage to public or private property caused by his agents or employees, and will authorize any other Subcontractor whose work has been damaged by his employees to repair such damage promptly and to bill him therefor which account the Subcontractor agrees to pay promptly.'
 
 
 14
 Article X. 'The Subcontractor will remedy immediately upon demand by the Contractor any defects in the Subcontractor's work and pay for any damage to other work resulting therefrom which shall appear within a period of one (1) year from date of final acceptance of the Contract. However, it is understood and agreed that where the specifications require a longer guarantee, that the specifications shall take precedence over this article.'
 
 
 15
 Article XV. '* * * The final payment will be made upon satisfactory completion of the contract, and final acceptance and settlement by the Owner.'
 
 
 16
 We think that the foregoing contract provisions adequately demonstrate that Acme's responsibility was limited to damages resulting from its negligence or defective work.
 
 
 17
 We cannot agree with the contention that the evidence was insufficient to show that a part of the roof damage was caused by Acme's improper installation. However, a careful appraisal of the evidence to determine its adequacy becomes unnecessary in view of our conclusions that the burden of proof was on Wunderlich to establish its right to a set-off. The court erred in placing the burden of proof upon Acme.
 
 
 18
 It is a settled rule that in a subcontractor's action against the cntractor, where a substantial performance of the contract is shown, th contractor, in order to avail himself of a set-off, has the burden of proving damages sustained on account of defective work done by the subcontractor. United States, for Use of Baltimore Cooperage Co. v. McCay, D.C., 28 F.2d 777; United States to Use of Forsberg v. Fleischmann Const. Co., D.C., 298 F. 320; United States for Use and Benefit of Lichter v. Henke Const. Co., 8 Cir., 157 F.2d 13; United States, to Use and for Benefit of Foster Wheeler Corp. v. American Surety Co., 2 Cir., 142 F.2d 726. And in United States ex rel. Johnson v. Morley Const. Co., 2 Cir., 98 F.2d 781, it was held that a federal building contractor's surety, asserting a set-off against the claim of a supplier of materials to the contractor for damages caused by defective materials, had the burden of proving its damages and, having failed to show how much of its damages were due to the claimant's fault, was not entitled to set-off.
 
 
 19
 The failure of Wunderlich to prove the amount of the roof damage caused by Acme's defective work is fatal to its claim of set-off.
 
 
 20
 The case is reversed with instructions to enter a judgment for Acme in conformity with the views herein expressed.
 
 
 
 [1]
 Hereinafter called Acme
 
 
 [2]
 Hereinafter called Wunderlich